IN THE DISTRICT COURT OF GUAM

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CRIMINAL CASE NO. 11-00051 |
| Plaintiff, | ) | |
| vs. | ) | **REPORT & RECOMMENDATION** |
| QUINCY PEREZ TAITANO, | ) | re Motion to Exclude Illegally Procured Evidence |
| Defendant. | ) | |

On December 20, 2011, the Chief Judge referred the Defendant's Motion to Exclude Illegally Procured Evidence (the "Motion"), ECF No. 23, to the below-signed judge. *See* ECF No. 25. The court held an evidentiary hearing on January 10, 2012. Representing the Government was Assistant U.S. Attorney Rosetta L. San Nicolas. Attorney Joseph Razzano appeared on behalf of the Defendant. At the conclusion of the hearing and at the request of the parties, the court permitted counsel to file no later than January 20, 2012, post-hearing briefs to supplement their respective arguments and positions.

On January 11, 2012, the Government filed the Government's Submission of Supplemental Case Law and Documents. ECF No. 50. On January 20, 2012, the Defendant filed a Supplemental Brief. ECF No. 53. Thereafter, the matter was deemed submitted for consideration. Upon review of the testimony adduced and evidence admitted at the hearing, and giving due consideration to the parties' argument and applicable case law, the court hereby issues the following report and recommends the Chief Judge DENY the Motion.

///

# FACTUAL FINDINGS[1]

On March 15, 2011, Lalanea Taitano ("Lalanea") arrived at the Dededo Precinct to file a complaint. She was accompanied by her 20-year old son Skyler Taitano ("Skyler"). Lalanea was interviewed by Jose S. White, Jr., an officer employed with the Guam Police Department ("GPD") since 2007. According to Officer White's testimony, Lalanea stated that she was married to the Defendant for about 20 years,[2] that they had four children together,[3] and that she and the Defendant had lived at a residence located in Yigo.[4] Officer White testified that Lalanea then proceeded to describe how she and the Defendant got embroiled in a verbal argument that soon escalated into a physical assault on March 5, 2011. As testified to by Officer White, the

---

[1] To the extent that a finding of fact should be deemed a conclusion of law, or a conclusion of law deemed a finding of fact, it shall so be considered and incorporated.

[2] Officer's White's testimony about the marriage between Lalanea and the Defendant was confirmed by Lalanea. According to Lalanea's testimony, she was then the Defendant's wife, and they had been married for 20 years. In July 2011, she divorced the Defendant, but shortly thereafter, perhaps in August 2011, the couple reconciled. Lalanea testified that she and the Defendant planned to remarry.

[3] In addition to Skyler, Lalanea and the Defendant had three minor children: C.T., E.T., and Z.T. Pursuant to Rule 49.1(a)(3) of the Federal Rules of Criminal Procedure, the court will make reference to the minor children by using their initials.

[4] Officer White testified that the residence was located at "*161* North Jose San Nicolas Street" in Yigo. The court notes that said house number is different from the description of the property as contained in the underlying search warrant application filed in Magistrate Case No. 11-00024. *See* Government Exhibit 3. Based on this application, the court issued a search warrant for "**145** N. Jose San Nicolas Street, Yigo, Guam." This discrepancy was not raised by the Defendant in his pleadings nor at the hearing. The court considers this to be a typographical error or mere oversight on the part of the Government. As the Ninth Circuit has stated, a search warrant is not invalid where "'the place to be searched is described with sufficient particularity to enable the executing officer to locate and identify the premises with reasonable effort, and [where] there is [no] reasonable probability that another premises might be mistakenly searched.'" *United States v. Turner*, 770 F.2d 1508, 1510 (9th Cir.1985) (no violation of Fourth Amendment where warrant contained wrong street address for house to be searched but description was otherwise sufficiently particular to identify premises) (quoting *United States v. McCain*, 677 F.2d 657, 660 (8th Cir.1982)), *cert. denied*, 475 U.S. 1026, (1986). In this case, the police officers and federal agents had no trouble locating and identifying the premises in question, nor did they mistakenly search the wrong house. The court shall hereinafter refer to this residence that was searched as the "Residence."

Defendant and Lalanea began arguing about why she was not home on the weekends. The argument soon became physical in the living room when Lalanea slapped the Defendant on the face. He grabbed her by the throat for about 30 seconds and then let go. Further argument ensued, and he grabbed her again, threw her on to the couch, pinned her down, and slapped her on the face twice. Officer White stated that Lalanea reported that C.T. observed what was transpiring and tried to stop her father's attacks on her mother. In response, the Defendant slapped C.T. on the face. Skyler also tried to intervene by grabbing his father, but the Defendant told him (Skyler) to let go or he (the Defendant) would break Skyler in half and then spit on his (Skyler's) mother's face. Lalanea managed to get free and then proceeded to her bedroom to retrieve her items from the closet. The Defendant followed her into the bedroom and the argument continued. The Defendant left the bedroom and began arguing with Skyler. Lalanea then walked out of the bedroom to where Skyler was located, but soon the Defendant flipped her to the ground and again pinned her down. Lalanea asked the Defendant to get off of her, and when he eventually did, she quickly left the Residence and headed to her mother's home on Talo Street in Dededo.

Officer White further testified that Lalanea said she decided to file a complaint against the Defendant because she was afraid of him. In addition to the March 5th assault, Lalanea further recounted an incident that occurred on March 14, 2011, when the Defendant arrived at Lalanea's mother's home. Lalanea was so terrified that she hid in the bathroom and did not come out. The Defendant eventually left, but he took their four-year old son Z.T. with him.

Officer White further testified that on March 15, 2011, he also interviewed C.T. and Skyler's girlfriend[5] about the March 5th incident, while Officer Shimizu interviewed Skyler. According to Officer White, their versions of the events that took place on March 5, 2011 corroborated Lalanea's rendition of the incident.

Following these interviews, police officers went to look for the Defendant but were unable to find him that day. The following day, March 16, 2011, officers went to the Residence

---

[5] Officer White could not remember the name of Skyler's girlfriend.

where they found the Defendant and arrested him. According to the testimony of Officer Joaquin C. Mesa, the Defendant was transported to the Dededo Precinct at about 2:55 p.m. Officer Mesa testified that at the precinct the Defendant made some statements and admitted that he had assaulted his wife and children on March 5, 2011.

On March 16, 2011, Lalanea arrived at the Dededo Precinct[6] and spoke with Officer White at about 3:40 p.m. She asked for a police escort to the Residence so that Lalanea could retrieve her clothing and her children's clothes. Officer White asked Lalanea who owned the Residence, and Lalanea told Officer White that she and her husband owned the Residence and they lived there with their children. This interview lasted about 15 minutes. Four police officers[7] riding in two separate patrol vehicles then proceeded to follow Lalanea and Skyler to the Residence to provide police protection. Although the Defendant had already been apprehended by this time,[8] Officer Joaquin C. Mesa testified that because the Residence was located on the Defendant's family compound and the Defendant's family members lived near the Residence, the officers believed that an escort was still needed for Lalanea and Skyler's security and safety. According to Officer White, the drive from the Dededo Precinct to the Residence took about 20 minutes.

Once the police, Lalanea and Skyler arrived at the Residence, there is some discrepancy

---

[6] There is some discrepancy about what brought Lalanea back to the Dededo Precinct. Officer White testified that Lalanea came to the precinct with her son Skyler to ask for a police escort to the Residence. Lalanea testified that she received a call on March 16, 2011, requesting her to come to the Dededo Precinct to pick up her son Skyler because he was arrested that afternoon. While she was there Lalanea asked for a police escort to the Residence to pick up her belongings.

[7] According to Officer Mesa's testimony, he recalls four officers present at the Residence. Three of these officers were Officer White, Officer Mesa, and Field Supervisor J.S. Cruz. The fourth officer was never identified.

[8] There was some confusion by Officer White about when exactly the Defendant was arrested. His testimony appeared to suggest that the Defendant was at the Residence when the police arrived as escorts with Lalanea and Skyler. However, this was refuted by Officer Mesa who testified that before the police escorted Lalanea and Skyler back to the Residence, the Defendant was already in police custody.

as to how Lalanea and the officers eventually gained entry into the Residence. According to Officer White, Lalanea had several keys in her possession, but when she tried to open the front door to the Residence, her key did not work. Apparently, the Defendant had changed the lock to the front door after Lalanea left on March 5, 2011. Officer White stated that Lalanea then gave Skyler a separate key to the rear door. Skyler then went to the back of the Residence while Officer White stayed at the front of the Residence with Lalanea. Officer White testified that he did not see how Skyler gained entry into the Residence. After a few minutes, Officer White saw Skyler open the front door from the interior of the Residence.

Officer Mesa testified that while he saw Lalanea and Skyler try to use a set of keys to open the front door to the Residence, but they were unsuccessful. While they were trying to gain entry at the front door, Officer Mesa testified that he began to wander toward the left rear side of the Residence where he encountered a male individual. Officer Mesa asked the individual to identify himself, and Officer Mesa then learned that the individual was the Defendant's father. Officer Mesa further testified that the Defendant's father indicated that Lalanea stayed at the Residence. After a few minutes, Officer Mesa learned that the front door had been opened, so he walked back to the front of the Residence where he saw the front door was opened and Skyler was standing inside the Residence. Officer Mesa stated that he did not instruct Lalanea to gain entry into the home nor did he instruct her how to get in the home. Officer Mesa further stated that he did not see how Skyler had entered the home.

Lalanea and Skyler's version of the events contradicted the officers' account. According to Skyler, when they arrived at the Residence, he and his girlfriend stood on the side talking and then decided to walk to his grandfather's house nearby while the officers spoke to his mother. Skyler returned outside and stated that the officers were talking to his mother about the key to the front door, but the key no longer worked. Skyler testified that he saw two to three officers walk around the Residence to check for possible entry through the windows and back door. Access to the back door could only be gained by going through the garage area. Skyler said that he then saw the officers pulling at the door leading to the garage area, but the door was
///

1  secured by a chain.[9]  There was not enough space for the officers to squeeze through to gain

2  entry to the garage, so Skyler stated the officers asked him to try to squeeze his way through the

3  doorway since he was much smaller than they were.  According to Skyler, the garage door was

4  very heavy and usually required two people to open it.  Skyler testified that the officers pulled

5  the garage door open as much as they could, creating about a six-inch gap, and the officers

6  continued to hold up the door while Skyler squeezed his way into the garage, where he found

7  the back door unlocked.  Skyler then went into the Residence and proceeded to open the front

8  door from inside the home.

9         Lalanea corroborated Skyler's testimony and stated that officers helped her son pry open

10  the garage door so that he could gain access to the back door.  She said the door was heavy and

11  it would not have been possible for her son to do it by himself, so at least one of the officers had

12  to assist Skyler.  When counsel for the United States and the court questioned Lalanea and

13  Skyler about the identity of these officers who allegedly assisted in holding open the garage

14  door, neither Lalanea nor Skyler could identify said officer or officers.  Additionally, Lalanea's

15  testimony was not consistent with her written statement provided to the police later that evening.

16  *See* Government Exhibit 2.  According to Lalanea's written statement

17  > Upon arrival at the house, [Lalanea] used a key to unlock the front, [but] the key did not work. [Lalanea's] son (Skyler) then went around the side to where the
18  > entrance into the garage [was].  He pryed (sic) open the door then went in through the back door.  ([Lalanea] ha[d] a key to the backdoor).  Then my Sky
19  > went into the house and unlocked the front door.

20  *Id.*  Lalanea's written statement did not include any mention that an officer or officers helped

21  pry the garage door open.  Instead, her written statement only mentions that her son pried open

22  the door and then went in the Residence through the back door.

23         Once Skyler opened the front door but before the officers and Lalanea proceeded into the

24  Residence, Lalanea informed the officers that the Defendant may have drugs and a weapon in

---

[9] Skyler also called the garage area the "shop" because it was the area where his father would paint cars.  The garage or shop door had a hinge on the top and would swing outward to open.  However, that day, Skyler described the garage door as being chained in two spots.  Skyler had no keys to those chains, and the padlocks to the chains were located on the inside of the garage.

the Residence. As a precautionary measure,[10] Officer Mesa decided to ask Lalanea to sign a "Consent Search for Residence" form (hereinafter referred to as the "Consent Form") before the police entered the Residence. Lalanea executed the Consent Form at about 3:55 p.m. *See* Government Exhibit 1.

Lalanea then escorted the officers into the Residence. She pointed out a container on the dining room table with a leafy substance, which police suspected was marijuana. The officers also detected a foul order they associated with marijuana based on their training. Lalanea went from room to room gathering her personal items and items belonging to the children, but as she did so, she continuously pointed out various items of interest to the police such as drug paraphernalia. Officer Mesa testified that without police prompting, Lalanea retrieved what appeared to be suspected "ice" from the closet of her bedroom. Lalanea also took the officers to the garage area and pointed out a "grow room" where several marijuana plants were growing. According to Officers White and Mesa, Lalanea did this willingly on her own and the officers did not instruct Lalanea what to do. According to Skyler, he did not stay in the house the whole time because he was walking in and out to carry belongings to the car and he would also go back and forth to his grandfather's house. Skyler testified that the officers asked him if he knew where the weapons were located and that the officer asked him to search for them. All Skyler could find were airsoft guns and paintball guns that belonged to him and his father. Skyler stated that this "search" lasted about three to four hours. Later that evening, Lalanea provided a written statement to the police. *See* Government Exhibit 2.

The following day, the Government appeared before the below-signed judge to apply for a federal search warrant. *See* Magistrate Case No. 11-00024 and Government Exhibit 3. The affidavit in support of the search warrant relied upon facts learned during the course of the search of the Residence as well as other information obtained during interviews with Lalanea and Skyler. *Id.* The court thereafter issued the search warrant, and federal law enforcement

---

[10] This was Officer Mesa's very first search of a residence. Officer Mesa did not know whether Officer White had any previous experience with home searches.

agents seized 54 suspected marijuana plants, a digital scale, seven small plastic sealable bags with white crystalline substance, and other suspected drugs or drug paraphernalia from the Residence. *See* Magistrate Case No. 11-00024, ECF No. 2.

On September 14, 2011, the Grand Jury issued an Indictment charging the Defendant with (1) Manufacturing a Controlled Substance, (2) Possession of a Controlled Substance with Intent to Distribute, and (3) Maintaining Drug-Involved Premises.[11]

On December 16, 2011, the Defendant filed the instant Motion. ECF No. 23. On December 23, 2011, the Government filed its Opposition brief. ECF No. 27. On December 30, 2011, the Defendant filed a Reply Brief thereto. ECF No. 28.

## LEGAL CONCLUSIONS

The Defendant's Motion seeks to exclude from trial all evidence that was procured through the alleged illegal search and seizure of the Residence on the basis that Lalanea could not lawfully consent to a search of said Residence. Additionally, the Defendant requests suppression of all evidence subsequently obtained through the federal search warrant.

The Fourth Amendment ordinarily prohibits the police from making a warrantless entry to a person's home to search for specific objects. Nevertheless, this prohibition does not apply when police obtain valid consent to search. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). Such consent may be give by "a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock*, 415 U.S. 164, 171 (1974). Common authority may be either actual or apparent. *See United States v. Ruiz*, 428 F.3d 877, 880 (9th Cir. 2005). The main issue presented is whether Lalanea could validly consent to the search of the Residence.

1. <u>Whether Lalanea had actual authority to consent to search</u>

A consensual search is reasonable when the consent-giver has actual authority over the area searched. *United States v. Matlock*, 415 U.S. 164 (1974). A third party has actual authority when he has "mutual use of the property and also has joint access or control for most purposes."

---

[11] The "controlled substance" referred to in the offenses charged was marijuana.

*United States v. Dearing*, 9 F.3d 1428, 1429 (9th Cir 1993) (quoting *Matlock*, 415 U.S. at 171 n.7). "'Common authority' rests on mutual use of the property by those generally having joint access or control so that it is reasonable to recognize that any of the parties has the right to permit inspection and others have assumed the risk that the third parties might consent to the search." *United States v. Yarbrough*, 852 F.2d 1522 (9th Cir. 1988). "The existence of consent to search is not lightly to be inferred and the government always bears the burden of proof to establish the existence of effective consent." *United States v. Reid*, 226 F.3d 1020, 1025 (9th Cir. 2000) (quoting *United States v. Shaibu*, 920 F.2d 1423, 1426 (9th Cir. 1990)).

The Defendant contends that Lalanea did not possess actual authority to consent to the search of the Residence since the Defendant owned it as his sole and separate property. In this case, it is not so important that the real property was deeded to the Defendant as his sole and separate property. Although Lalanea's name was not on the deed to the real property, this did not mean that she did not own part of the home. The Government argues that her ability to consent to a search of the Residence did not rest upon the law of property but rather on her mutual use of the property and her joint access to the premises. The Government is correct on this point of law; generally, anyone who has a reasonable expectation of privacy in a place being searched can consent to a warrantless search. A landlord cannot validly consent to the search of a house he owns if he rents it to another, but a tenant, who does not own the property, certainly can consent to such a search. *See Matlock*, 415 U.S. at 171 n.7. Thus, in order to prove that Lalanea had actual authority to consent to the search the Government must demonstrate that she had "joint access or control for *most* purposes." *Id.* (emphasis added). Because such an inquiry is very fact specific, the court finds it helpful to discuss relevant cases and compare those facts with facts herein.

In *United States v. Long*, 524 F.2d 660 (9th Cir. 1975), the defendant's wife told the FBI that she left the home she shared with her husband because she feared for her safety and was afraid she could be dragged in to what she believed was illegal activity by her husband. *Id.* at 661. She had obtained separate housing but had returned to the home with FBI agents to retrieve some of her own possessions. *Id.* She signed a consent form allowing the agent to

search the home. *Id.* The keys she had "no longer fit the locks and so entrance was gained by removing a window in a storage building next to the house." *Id.* In the storage building agents found a firearm hanging on the wall. *Id.* The serial number was copied, and the gun was eventually traced to a pawnshop. *Id.* Agents later learned that the defendant had purchased the gun under a false name and had purchased another gun at the same time. *Id.* On appeal, the defendant challenged the validity of his wife's consent to search the house since she not longer had joint access or control over the home. The Ninth Circuit disagreed with the Defendant and found the wife's consent to be valid because she was a joint *owner* of the house and had been forced to leave because of her fear of her husband. *Id.*

In *Illinois v. Rodriguez,* 497 U.S. 177 (1990), the police were summoned to a residence and spoke with a "Gail Fischer, who showed signs of a severe beating." *Id.* at 179. Ms. Fischer told the police that the defendant had assaulted her earlier that day at the defendant's apartment. During the interview, Ms. Fischer referred to the apartment as "our apartment" and mentioned that she had clothes and furniture there. *Id.* Ms. Fisher took the police to the apartment, unlocked the door with her key, and gave the police permission to enter in order to arrest the defendant. *Id.* at 180. The police did not obtain an arrest warrant nor did they seek a search warrant. *Id.* When the police entered the living room, "they observed in plain view drug paraphernalia and containers filled with white powder that they believed . . . to be cocaine." *Id.* They later found the defendant asleep in the bedroom, along with additional containers of white powder, and thereafter arrested him and seized the drugs. *Id.* The defendant moved to suppress all the evidence seized at the time of his arrest, arguing that Ms. Fischer had no authority to consent to the entry since she had vacated the apartment several weeks earlier. *Id.* The Supreme Court affirmed the lower court's finding that Ms. Fischer did not have common authority over the apartment since she "was not a 'usual resident' but rather an 'infrequent visitor' at the apartment." *Id.* The lower court based its conclusion on its findings that (1) her "name was not on the lease," (2) "she did not contribute to the rent," (3) "she was not allowed to invite others to the apartment on her own," (4) "she did not have access to the apartment when [defendant] was away," and (5) she had moved out of the apartment "almost a month before the

search at issue" and had taken "her and her children's clothing with her, though leaving behind some furniture and household effects." *Id.* at 180-81. Although Ms. Fischer did not have common authority to consent to the warrantless entry and search, the Supreme Court remanded matter for further determination on the issue of apparent authority.

The facts of *Long* are similar to this case. Just as in *Long*, Lalanea's key to the front door no longer fit the locks so entry into the Residence was gained by other means. The Defendant asserts that unlike *Long* Lalanea did not *co-own* the Residence since her name was not on the deed. *See* Taitano Decl., ECF No. 24 and Exh. A thereto. According to the Deed of Gift, the Defendant's father gave the Defendant all right, title and interest to the real property on which the Residence is located. *Id.* However, upon review of the Construction Mortgage, the court notes that both Lalanea and the Defendant are listed as "borrowers" of the $73,000 used to construct the Residence. *See* Government Exhibit 12. Lalanea also signed a Spousal Consent form attached to the Construction Mortgage and Mortgage. *Id.* The court disagrees with the assertion that Lalanea was not a co-owner of the Residence. Lalanea testified that she and the Defendant borrowed the money to construct the Residence and a portion of her salary was contributed to pay the mortgage. Based on this document and Lalanea's testimony, the court finds that the Residence, which is an improvement on the Defendant's separate real property, is community property, and Lalanea is a joint owner of said Residence. Lalanea testified that she believed she was a part owner of the home. Lalanea attested that she, the Defendant and their family began living on the property that surrounds the Residence since late 1999, and thereafter began living at the Residence upon completion of the construction of the home in 2006. Lalanea contributed to the family's living expenses; a portion of her teacher's salary paid for the monthly utility bills as well as about $513 towards the monthly mortgage. In fact, Lalanea stated that she believed she owned a part of the Residence since the bank would call her for payment of the mortgage loan. Unlike *Rodriguez*, there was never any testimony presented that Lalanea was not allowed to invite others to the Residence on her own or that she needed the Defendant's permission to do so. Lalanea was a "usual resident" of the Residence in addition to the fact that she was a joint owner. She knew the layout of the home, and until recently she had

a key that would open the front door of the Residence. The court is not persuaded by the Defendant's assertion that Lalanea left the Residence "willingly." Lalanea did not simply abandon her home; rather, she left after she was physically assaulted by her husband. Like the wife in *Long,* Lalanea had been forced to leave the Residence because of she feared for her physical safety and was afraid of her husband.

Based on these facts, the court finds that Lalanea had actual authority to consent to the search of the Residence and that such consent was validly given when she signed the Consent Form and allowed the police to enter her home. However, if it is later determined that these facts do not properly support a finding of actual authority, the court will continue its analysis of whether the GPD officers reasonably believed Lalanea had apparent authority to consent to the search of the Residence.

    2.    <u>Whether Lalanea had apparent authority to consent to the search</u>

If Lalanea did not have actual authority to consent, the initial entry and search of the Residence may still be upheld under the "apparent authority" doctrine. The Ninth Circuit utilizes a three-part test to determine whether a person possessed "apparent authority:" first, "did the searching officer believe some untrue fact that was then used to assess the consent-giver's use of and access to or control over the area searched;" second, "was it under the circumstances objectively reasonable to believe that the fact was true;" and third "assuming the truth of the reasonably believed but untrue fact, would the consent-giver have had actual authority?" *Reid*, 226 F.3d at 1025 (reversing the trial court's finding of apparent authority because it was unreasonable for officers to believe that merely because a person answered the door to an apartment – without more - that he was a resident of that apartment). *See also Dearing*, 9 F.3d at 1429-30 (no apparent authority; agent's belief that person who lived in house as caretaker and occasional housekeeper, had use and access to or control over homeowner's bedroom so as to establish apparent authority to consent to search of bedroom was objectively unreasonable; although agent knew that caretaker had been in the bedroom on prior occasions, there was nothing to indicate that the prior access was authorized, the bedroom door was closed at time of search, and agent knew that caretaker's relationship with homeowner was nearing an end). "The

'apparent authority' doctrine applies only to mistakes of fact, not mistakes of law." *United States v. Ruiz*, 428 F.3d 877, 881 (9th Cir. 2005).

Here, the Government contends that if Lalanea lacked common authority to consent to the search, the apparent authority doctrine would be applicable to validate the warrantless search. Thus, in applying the three-part test, the court must first determine whether Officers White and Mesa believed some untrue fact that they then used to assess Lalanea's use and access to or control over the Residence. The Government contends that this "untrue fact" was that Lalanea had authority to consent to search of the Residence. Again, this inquiry is fact-dependent.

Before the officers entered the Residence they knew that (1) Lalanea had been married to the Defendant for about 20 years and had four children with him; (2) Lalanea lived in the Residence at least until March 5, 2011, when she left to live at her mother's home after the Defendant physically assaulted her; (3) the assault forced Lalanea to quickly depart from the Residence and Lalanea left behind items of personal belonging; and (4) Lalanea appeared at the Dededo Precinct to request a police escort so that she could return to the Residence to retrieve her belongings and her children's clothing; (5) Lalanea had keys to the Residence but the key to the front door no longer worked; and (6) the Defendant's own father admitted that Lalanea stayed at the Residence. Based on these facts, the representations made by the Defendant's father and Lalanea, and the fully executed Consent Form, the officers believed that Lalanea had lived at the Residence recently and had access to, control of, and authority over the Residence such that she could consent to its search. This satisfies the first part of the test.

The second issue is more critical: was the officers' belief objectively reasonable under the circumstances. Although Lalanea claimed to have keys to the house, these keys obviously did not work on the front door. The Defendant contends that this fact should have triggered further inquiry on the part of the police because at that time it was patently obvious that Lalanea no longer had access to the Residence. The court is cognizant of the Ninth Circuit's warning that

///

> the police are not allowed to proceed on the theory that "ignorance is bliss." Even when the invitation to search is accompanied by an explicit assertion that the person lives there, the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth and not act upon it without further inquiry.

*Dearing*, 9 F.3d 1993 (internal quotations and citations omitted).

In this case the court concludes that the officers' belief that Lalanea had control of and authority over the Residence such as to validly consent to its search was reasonable. Although Lalanea's keys to the front door did not work, she had a key to the back door which she gave to Skyler and he managed to gain entry to the home through the back door. The court finds the officers' testimonies to be credible and believes that they did not instruct or assist Skyler in gaining entry into the home. The officers' testimonies were consistent; neither saw how Skyler managed to gain access to the back door and eventual entry into the home. Officer Mesa testified that he believed entry into the home was lawfully made because "Lalanea would not try to break into the home with police present."

The testimonies of Skyler and Lalanea, however, were not credible. Neither could identify the officer or officers who allegedly helped Skyler pry open the garage door so that he could "squeeze" in to the garage area and gain access to the back door. When questioned about this, both Skyler and Lalanea seemed nervous on the witness stand and could not provide much details. Lalanea's testimony is contradicted by her very own witness statement, which was written after the search of the Residence when her memory of the events were much clearer and more recent. That written statement fails to mention the "details" she testified to, such as the police assisting in prying open the door. Her written statement merely states that it was Skyler who pried open the garage door. Lalanea's statement even indicates that she had a key to the back door, which corroborates Officer White's testimony that Lalanea gave Skyler a key to the back door. While Skyler testified that the police went to the back of the house looking for a way in, Lalanea's statement mentions only Skyler going "around the side to where the entrance into the garage" was. The court believes Lalanea and Skyler have a strong motive to embellish how Skyler gained entry into the house. It is obvious that Lalanea still loves the Defendant, since she testified that they intend to remarry. The inconsistencies in their testimonies coupled with their

loyalty to the Defendant gives the court reason to disbelieve several parts of their testimony about how the police essentially "broke in" to the garage area in order to give Skyler access to the back door. Based on the circumstances present at the time, it was reasonable for the police to believe that Lalanea had authority to consent to the search of the Residence.

Finally, as to the third part of the test, assuming the truth that the officers reasonably believed that Lalanea had access to, control of or authority over the Residence, the court must decide whether Lalanea would have had actual authority. Based on the above analysis and the facts presented, the court finds that Lalanea would have had actual authority to consent to the search of the Residence and validly did so. Accordingly, the search of the Residence performed after Lalanea signed the Consent Form was valid under the apparent authority doctrine.

### 3. Whether search warrant lacked probable cause once tainted information is excised

The exclusionary rule requires that evidence obtained directly or indirectly through government violation of the Fourth Amendment may not be introduced by the prosecution at trial, at least for the purpose of providing direct proof of the defendant's guilt. The court has already concluded that Lalanea had the authority – both actual and apparent – to consent to the search. However, assuming that Lalanea lacked such authority, it is important for the court to decide whether to exclude all evidence obtained as a result of the federal search warrant issued by the below-signed judge. The Defendant requests the court to suppress not only the evidence obtained during the warrantless search and entry into his home, but also all evidence gained by the search authorized by the search warrant, arguing that said evidence is "fruit of the poisonous tree" – the initial unlawful entry and search – and must be suppressed.

When illegally-obtained or otherwise tainted evidence is included in the search warrant, a reviewing court must excise the offending portion of the warrant and reevaluate whether it continues to support probable cause without the improper evidence. *See United States v. Bishop*, 264 F.3d 919, 924 (9th Cir 2001) ("Once the district court determined that the search warrant included illegally obtained information, it properly purged the affidavit of the offending facts and examined whether the remaining facts still afforded a substantial basis for concluding that

the search warrant was supported by probable cause."). Thus, if all the information concerning the search of the Residence pre-warrant is excluded from consideration, the court must decide whether there would still be sufficient information in the affidavit to support a finding of probable cause to search the Residence.

Paragraphs 20 and 21 of the affidavit in support of the search warrant application describe an interview officers conducted with Lalanea and Skyler after the entry into the home. These interviews were testified to by ATF Task Force Officer Edgar Tiamzon and DEA Task Force Officer Jimmy Manglona. During these interviews, Lalanea and Skyler provide further details about the types of firearms they had seen the Defendant with in the Residence. Additionally, according to ¶22, the Defendant was a convicted felon who did not have a current valid firearms identification card. Thus, if the Defendant possessed a firearm, he would be in violation of federal law, and the court would have had sufficient probable cause to permit the agents to search the home for firearms. During such an authorized search, the officers would likely have found the drugs, paraphernalia and marijuana plants as well. Under the plain view doctrine,[12] the police would have been justified in seizing the contraband evidence. Thus, even if the court were to strike any "tainted" portions from the search warrant application, the remaining facts still afforded a substantial basis for concluding that the search warrant was supported by probable cause, and thus the request to suppress the evidence found as a result of the search warrant should be denied.

///

///

---

[12] To justify a seizure based on plain view, three conditions must be satisfied. First, the seizing officer must not have violated the Fourth Amendment "in arriving at the place from which the evidence could be plainly viewed." *Horton v. California*, 496 U.S. 128, 136 (1990). Here, the police had a search warrant to be in the Residence. Second, the item must not only be in plain sight, but "it's incriminating character must also be immediately apparent." *Id.* (quotation omitted). The incriminating nature of the marijuana plants and the packets with white powder would be evident to the police. Finally, "not only must the officer be lawfully located in a place from which the object can be plainly seen, but he or she must also have a lawful right of access to the object itself." In this case, the officers would have a lawful right of access to any place in the Residence or its curtilage where a firearm may have been stored.

United States of America v. Quincy Perez Taitano, Criminal Case No. 11-00051
Report and Recommendation re Motion to Exclude Illegally Procured Evidence
page 17 of 17

# RECOMMENDATION

Based on the above analysis, the court finds that (1) Lalanea had common authority – both actual and apparent – of the Residence, thus rendering her consent to search valid; and (2) even if Lalanea's consent was invalid, if all the information concerning the search of the Residence pre-warrant was excluded from consideration, there would still be sufficient untainted information in the Officer Tiamzon's affidavit to support a finding of probable cause to search the Residence for firearms. Accordingly, the below-signed judge recommends that the Chief Judge deny the Defendant's Motion to Exclude Illegally Procured Evidence in its entirety.

IT IS SO RECOMMENDED.



**/s/ Joaquin V.E. Manibusan, Jr.**
**U.S. Magistrate Judge**
**Dated: Feb 17, 2012**